1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

DONTE BELL,

               Plaintiff,

    v.

NATIONAL CREDIT SERVICES INC.,

               Defendant.

CASE NO. 2:19-cv-01727 RAJ-BAT

**REPORT AND
RECOMMENDATION**

      Before the Court is Defendant National Credit Systems, Inc.'s ("NCS") Motion for Summary Judgment pursuant to Fed. R. Civ. P. 56. Dkt. 94. NCS seeks summary judgment on Plaintiff Donte Bell's claims of violations of the Fair Credit Reporting Act ("FCRA"), 15 U.S.C. § 1681 *et seq*; the Fair Debt Collection Practices Act ("FDCPA"), 15 U.S.C. § 1692, *et seq*; and Washington's Unfair Business Practices –Consumer Protection Act ("WCPA"), Chapter 19.86. *See* Second Amended Complaint (Dkt. 59). Mr. Bell stipulates to the dismissal of his WPCA claim but opposes the remainder of the motion. Dkt. 96.

      For the reasons stated herein, the undersigned recommends that NCS's motion for summary judgment be granted.

<u>STANDARD OF REVIEW</u>

      Summary judgment is appropriate when, viewing the facts in the light most favorable to the nonmoving party, there is no genuine dispute as to any material fact that would preclude the entry of judgment as a matter of law. *Addisu v. Fred Meyer, Inc*., 198 F.3d 1130, 1134 (9th

Cir.2000). The party seeking summary dismissal of a claim "bears the initial responsibility of

informing the district court of the basis for its motion" (*Celotex Corp. v. Catrett*, 477 U.S. 317,

323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986)) and identifying those portions of the materials in

the record that show the absence of a genuine issue of material fact (Fed. R. Civ. P. 56(c)(1)).

Once the moving party has satisfied its burden, it is entitled to summary judgment if the

non-moving party fails to designate "specific facts showing that there is a genuine issue for

trial." *Celotex Corp*., 477 U.S. at 324. "The mere existence of a scintilla of evidence in support

of the non-moving party's position is not sufficient:" the opposing party must present probative

evidence in support of its claim or defense. *Arpin v. Santa Clara Valley Transp. Agency*, 261

F.3d 912, 919 (9th Cir.2001); *Intel Corp. v. Hartford Accident & Indem. Co*., 952 F.2d 1551,

1558 (9th Cir.1991). In other words, "summary judgment should be granted where the

nonmoving party fails to offer evidence from which a reasonable jury could return a verdict in its

favor." *Triton Energy Corp. v. Square D Co*., 68 F.3d 1216, 1221 (9th Cir.1995).

<u>FACTS</u>

On December 10, 2013, Mr. Bell entered into an Apartment Lease Contract ("Lease")

with Copper Ridge Apartments ("Copper Ridge") for an apartment located at 4600 Davis Ave.

S., #K103, Renton, WA 98055 ("Premises"). Dkt. 59, ¶ 22; *see also* Lease (attached as Exh. A to

Dkt. 94). Mr. Bell also entered into a Tenant Bond Enrollment & Bond Acknowledgement

Agreement ("Bond") with SureDeposit/Assurant ("Sure Deposit") and paid a non-refundable

premium of $262.50 to Sure Deposit for bond coverage of $1,500.00. The Bond states, in

relevant part:

> [T]he bond provides coverage for any physical damage to the apartment (beyond
> normal wear and tear) or any of my obligations under the lease agreement that are
> not paid, such as past due rent, unpaid rent, or fees up to the "Bond Coverage
> Amount" only. If the apartment community makes a valid claim in strict

compliance with the lease terms that I owe it money because I created damage or did not fulfill lease obligations, such as paying rent or applicable fees, [Sure Deposit] will be obligated to pay the claim including collection expenses, court costs, or attorney fees not to exceed the "Bond Coverage Amount." *I will then be obligated to pay [Sure Deposit] the amount of the claim.*

Dkt. 59 at ¶ 23; Dkt. 94, Ex. B (emphasis added).

After Mr. Bell failed to pay his rent as it came due, Copper Ridge filed a writ of restitution seeking possession, rent, and other fees and costs. On September 30, 2014, Copper Ridge obtained an eviction judgment against Mr. Bell for unpaid rent, interest, attorney fees, and costs ($1,035.74 judgment for rent, $28.07 per diem rent until Mr. Bell vacated the premises, $600.00 attorneys' fees, and $519.00 court costs, plus interest accruing at the rate of 12% per annum). Dkt. 94, Ex. C (Agreed Findings of Fact; Conclusions of Law; Judgment; Order Granting Writ of Restitution). Mr. Bell signed the Agreed Order. *Id.*

Mr. Bell vacated the Premises on October 10, 2014. Dkt. 59 at ¶ 30. With additional rent due and owing, utilities, an early termination fee, and damage to the property, Copper Ridge calculated that Plaintiff owed it $6,893.56. Dkt. 94, Exh. D, pp. 2-3 ("Final Account Statement").

On October 31, 2014, Copper Ridge made a claim to Sure Deposit for the $1,500 bond amount. Dkt. 94, Ex. E (Claims Submission Form).

On November 18, 2014, Copper Ridge referred Mr. Bell's debt of $5,393.56 to NCS (Account No. 3073822) and "SureDeposit/Copper Ridge" referred Mr. Bell's debt of $1,500 to NCS (Account No. 3073823). Dkt. 94, Ex. P, Declaration of Ron Sapp, Vice President of Operations for NCS, ¶¶ 2, 4; Ex. G; Ex. H. According to Mr. Sapp, Copper Ridge and Sure Deposit are separate creditors with separate debts and both represented to NCS that Mr. Bell's accounts with them were accurate at the time they referred the debts to NCS. *Id.*, Ex. P., Sapp Decl., ¶¶ 6-8.

On November 24, 2014, Sure Deposit paid the $1,500 bond to Copper Ridge. Dkt. 94, Ex. F (cashed check).

On April 8, 2016, NCS first reported the Copper Ridge and Sure Deposit debts to three credit reporting agencies, Experian, Equifax and Trans Union (the "CRAs"). Dkt. 94, Ex. G (Copper Ridge Account Notes) and Ex. H (Sure Deposit Account Notes); *see also* Dkt. 94, Ex. P, Sapp Decl., ¶¶ 25(G) and (H). NCS reported the debts to the CRAs monthly from April 8, 2016 through April 24, 2019. *Id.*, Ex. G, p. 6 of 1; Ex. H, p. 13 of 1. NCS is submitting credit reporting on only one account for Copper Ridge (Account No. 3073822) and only one account for Sure Deposit (Account No. 3073823) and this reporting has not changed since the Copper Ridge and Sure Deposit Accounts were referred to NCS. Dkt. 94, Sapp Decl., ¶ c.10.

On April 23, 2019, Plaintiff sent NCS a letter requesting all documents pertaining to his account, including the contract with his signature, NCS' authorization to report to the credit bureau, a complete payment history, and eviction papers. Dkt. 94, Ex. I. NCS Account Notes indicate that after receipt of this letter, NCS verified Plaintiff's identity and the amounts owed and marked Plaintiff's accounts as disputed with the CRAs. Dkt. 94, Ex. G; Ex. H. NCS Account Notes from April 24, 2019 state:

> The dispute letter received, insufficient or no evidence was provided. *Sending letter requesting additional supporting evidence.* We received a certified dispute letter from the consumer. We have verified the identity of the consumer and the amount being pursued for collection matches the amount the creditor claims is owed. The dispute is generic, does not identify the specific item of information in dispute, explain the basis for the dispute, or include the necessary supporting documentation. I sent an email to have the outcome of our investigation mailed to the consumer and request that they provide additional information concerning their dispute.

Dkt. 94, Ex. G, p. 7; Ex. H, p. 6 (emphasis added). According to Mr. Sapp, NCS employees are trained to make notes contemporaneously with completing the task, such as making phone calls,

sending emails or reviewing consumer disputes. Dkt. 94-16, Ex. P, Sapp Decl., p. 4. Mr. Sapp also testified that the letter acknowledging the customer's dispute, indicating a lack of sufficient evidence to validate the dispute, and requesting additional supporting evidence (which is referred to in the Account Notes), was "substantially identical" to the "template letter" on which "it bases its validation letters, which is attached as Ex. J to NCS's motion. Dkt. 94, Ex. J. Mr. Sapp states that the letter would have been updated with Mr. Bell's name and address prior to being sent to Mr. Bell. Dkt. 94, Ex. P, ¶ 25.j.[1] NCS Account Notes also indicate that on April 25, 2019 a "Debt Investigated On-Demand" letter was sent to Mr. Bell's address. Dkt. 94, Ex. G; Ex. H.

On May 10, 2019, Mr. Bell obtained a report from PrivacyGuard, entitled "3 Bureau Credit Report with 3 Bureau VantageScores as of 5/9/2019." Dkt. 96-2, Declaration of Donte Bell, Ex. 1 (The "First PrivacyGuard Report").[2] PrivacyGuard, which is not a party to this action, describes itself as a "leading provider of credit and identity theft protection." www.privacyguard.com/customerservice/ about Us.html. Among its advertised services, is access to a monthly "triple-bureau credit report," containing credit information from Equifax, Experian, and TransUnion. www.privacyguard.com/ credit-report.html.[3]

The First PrivacyGuard Report lists the CRAs (Experian, Trans Union, and Expedia) as reporting two separate debts for the Copper Ridge and Sure Deposit debts ($5,390.00 and $1,500.00, respectively). The two separate debts are reflected more than once under various

---

[1] Counsel for NCS also represents that any documents filed on the record which contain information of actual persons (as opposed to test account information) have been redacted. Dkt. 97, p. 11 n.2.

[2] The Court summarizes relevant portions of the reports here merely to reflect the manner in which the two debts are exhibited and categorized. Defendant's hearsay objection to PrivacyGuard's reports is discussed below.

[3] Website last visited by Court on January 11, 2021.

REPORT AND RECOMMENDATION - 5

categories, including "Open Accounts," "Collection Accounts," "Other Accounts," and

"Derogatory Information":[4]

  1)  Experian: The Copper Ridge and Sure Deposit debts are identified as debts to "NCS"
      and are each included once in three separate categories:  (1) "Collection Accounts"
      (A/C# 9 for $5,390; A/C# 10 for $1,500); (2) "Other Accounts" (A/C# 15 for $5,393;
      A/C# 16 for $1,500); and (3) "Derogatory Information" (A/C# 11 for $5,393; A/C#12
      for $1,500). *See* Dkt. 96-3, Ex. 1, pp. 19-20; 30-31; 39-40.

  2)  TransUnion:  The Copper Ridge and Sure Deposit debts are each included once in
      two separate categories: (1) "Open Accounts" (A/C# 7 for $5,393 and A/C# 8 for
      $1,500); and (2) "Collection Accounts" (A/C# 6 for $5,939 and A/C# 7 for $1,500).
      *See* Dkt. 96-3, Ex. 1, pp. 12-13; 17-18.

  3)  Equifax:  The Copper Ridge debt of $5,393 is included once in four separate
      categories and is identified as A/C# 1 in each category: (1) "Open Accounts," (2)
      "Collection Accounts," (3) "Other Accounts," and (4) "Derogatory Information." *See*
      Dkt. 96-3, Ex. 1, pp. 8, 14, 21, and 32.

Mr. Bell's counsel argues that every time the Copper Ridge and Sure Deposit debts

appear in the PrivacyGuard Report, these are separate "tradelines." The term "tradeline is not

well defined in Mr. Bell's papers or elsewhere. The Court infers that "tradeline" refers to the data

that a creditor or debt holder reports about its own accounts to a consumer credit agency. *See*,

*e.g.*, *Gold v. Midland Credit Management, Inc.*, 82 F.Supp.3d 1064, 1077 n.8 (N.D. Ca. May 10,

2015).

On May 14, 2019, Mr. Bell received the Debt Verification Email from National Credit

Systems <docrequest@nationalcredit systems.com, referring to Account ID: 305738 Debt

Verification Email, stating: "The attached document file(s) contain the information that you have

requested." Dkt. 96, Ex. 2. Attached to the Debt Verification Email is a letter dated May 14,

2019 from Copper Ridge to Mr. Bell, referring to the current creditor as COPPER RIDGE

---

[4] Other debts not relevant here, also appear numerous times on PrivacyGuard's report under
several categories.

REPORT AND RECOMMENDATION - 6

APTS; the Client Account Number as K103, and NCS Account No. 3057738; Balance of $6,893.56. The letter states:

> Enclosed you will find copies requested.
>
> If a balance is remaining on your account (see above), you may send payment in full to National Credit Systems, Inc.
>
> Otherwise, you may contact our office immediately at (404) 629-2728.
>
> It is important to know that National Credit Systems, Inc. is a third party debt collection agency whose efforts are solely on behalf of the current creditor who has previously validated this debt.

Dkt. 96, Ex. 2. Attached to the letter is an itemization of "the charges assessed by the original creditor," Copper Ridge Apts for Unit K103, which essentially mirrors the items contained in the October 20, 2014 Copper Ridge Final Account Statement to Mr. Bell. *Compare* Dkt. 96, Ex. 2 with Ex. D.

On May 14, 2019, NCS sent to Plaintiff a "Debt Verification Email" for Account ID 3057738. Dkt. 96-2, Declaration of Donte Bell, ¶ 6, Ex. 2 ("Debt Verification Email"). The Debt Verification Email listed Copper Ridge as the "Current Creditor", with a balance of $6,893.56. *Id.*, p. 3. Attached to the letter is an itemization of "the charges assessed by the original creditor," Copper Ridge Apts for Unit K103, which essentially mirrors the items contained in the Copper Ridge Final Statement. *Cf.* Dkt. 96, Ex. 2 with Ex. D. No reference is made to Sure Deposit or the $1,500 payment made to Copper Ridge by Sure Deposit. *Id.* The account identified in the Debt Verification Email (No. 3057738) differs from NCS' identification of the two debts (Account No. 3073822 for Copper Ridge and Account No. 3073823 for Sure Deposit).

On June 28, 2019, Mr. Bell sent letters by certified mail to each of the CRAs, stating:

> I am writing to dispute the confusing reporting of multiple accounts on my credit that seem to refer to one single debt, a disputed debt from when I lived at Copper Ridge Apartments a long time ago.

> [Equifax] [TransUnion] [Experian] is reporting multiple accounts showing
> I owe multiple debts, but there is only ONE alleged debt associated with this
> apartment. [Equifax] [TransUnion] [Experian] must immediately remove ALL its
> erroneous accounts listing this debt. Please send me my updated credit report after
> you have removed the mistaken accounts.

Dkt. 94, Ex. K ("Dispute Letters") (the letters are dated June 13, 2019, but postmarked June 28,

2019) (emphasis in originals).

The CRAs sent an Automated Credit Dispute Verification ("ACDV") to NCS regarding

Mr. Bell's dispute and in response, on July 9, 2019, July 13, 2019, and July 15, 2019, NCS

reported the Copper Ridge and Sure Deposit as disputed. Dkt. 94, Ex. L; *see also* Exh. P, ¶

25(L). NCS provides Exhibit L, a "printout of records reflecting the data submitted in NCS's

automated credit disputes verifications, which are the responses that NCS sent to the credit

bureaus in response to Plaintiff's tradeline disputes." *Id.* Mr. Sapp explains that there is one

ACDV dispute response for Equifax, two ACDV responses for Experian (one for Copper Ridge

and one for Sure Deposit), and two ACDV dispute responses for Trans Union (one for Copper

Ridge and one for Sure Deposit). Dkt. 94, Ex. P, Decl. of Sapp. The Account Notes for both the

Copper Ridge and Sure Deposit accounts indicate NCS initiated three reviews in response to the

three disputes sent by Mr. Bell to the three CRAs. *Id.*, Ex. G and H ("Claims inaccurate

information Received assignment of consumer dispute and claim – review process started.

Attempting to validate claim by comparing disputed information to NCS system data provided

by client.")

NCS states that it has produced the versions of the ACDVs that it has available. Dkt. 97, p. 11. The ACDV forms sent by the CRAs and the ACDV responses from NCS to the CRAs were not provided.[5]

On July 14, 2019, Trans Union advised Mr. Bell that it had investigated his dispute, verified that the Copper Ridge and Sure Deposit accounts belonged to him, and indicated how each of the items appeared on Mr. Bell's credit report with Trans Union. Dkt. 94, Ex. M. The Trans Union report reflects two accounts reported by NCS (one for Sure Deposit in the amount of $1,500 and one for Copper Ridge in the amount of $5,393). *Id.* The report also reflects that the only update made by Trans Union to its report was to change the date. *Id.* Mr. Bell does not recall receiving this response but obtained a copy of Trans Union's response through discovery. Dkt. 96-1, McCraw Decl., ¶ 2, Ex. 4 ("Trans Union's Dispute Response").

On October 8, 2019, Mr. Bell obtained another PrivacyGuard credit report entitled September 2019 Compiled Consumer Report, listing Trans Union, Experian, and Equifax consumer reports "as of 9/26/2019" (the "Second PrivacyGuard Report"). Dkt. 96-2, Bell Decl., ¶ 8; Ex. 5. Again, the report contained multiple references to the Copper Ridge and Sure Deposit debts ($5,390.00 and $1,500.00, respectively) under several different headings, including "Open Accounts," "Collection Accounts," "Other Accounts," and "Derogatory Information":

1) <u>Experian</u>: The Copper Ridge and Sure Deposit debts are identified as debts to "NCS" and are each included once in two separate categories: (1) "Open Accounts" (A/C# 1 for $1,500 and A/C # 2 for $5,393); and (2) "Derogatory Information" (A/C# 3 for $1,500; A/C#4 for $5,393). *See* Dkt. 96-7, Ex. 5, pp. 11-13; 19-20.

---

[5] Counsel for Mr. Bell complains of "NCS's consistent refusal to participate in good faith discovery," (Dkt. 96, p. 7), and points out that the relevant ACDV forms were missing from NCS's document production (*id.*, p. 22, n. 6). However, no motion relating to discovery has been filed with the Court and the deadline for doing so has long since passed (*see* Dkt. 52 (7/24/20 deadline for discovery motions; 8/24/20 deadline for completion of discovery).

2) <u>TransUnion</u>:  The Copper Ridge and Sure Deposit debts are each included once in the category of "Collection Accounts" (A/C# 3 for $1,500 and A/C# 4 for $5,939). *See* Dkt. 96-7, Ex. 5, pp. 13-14.

3) <u>Equifax</u>:  The Copper Ridge debt of $5,393 is included once in two separate categories and is identified as A/C# 8 in each category: (1) "Collection Accounts," and (2) "Derogatory Information." *See* Dkt. 96-37, Ex. 5, pp. 16, 22.

Mr. Bell claims that NCS's incorrect reporting affected his ability to obtain credit on favorable terms and that "recently" he had tried to purchase a car and was humiliated and emotionally distressed by being offered unfavorable credit terms of between 13 and 20 percent. Dkt. 59, ¶¶ 56-58.

Mr. Bell admits that he did not obtain credit reports directly from TransUnion, Equifax, or Experian between May 9, 2019 through November 8, 2019, and is relying solely on the two PrivacyGuard Reports to support his claims against NCS. Dkt. 94, Ex. N, Plaintiff's Responses to Requests for Admission Nos. 10, 11, 12, and 13.

NCS has never furnished credit information to PrivacyGuard. Dkt. 94, Ex. P, Sapp Decl., ¶ c.9. NCS account notes reflect that NCS has been reporting "one account for each account" to the CRAs, for a total of two accounts since the Copper Ridge and Sure Deposit accounts were referred to NCS. *Id.*

<u>EVIDENTIARY ISSUES</u>

NCS objects to the Court's consideration of the PrivacyGuard Reports of May 10, 2019 and October 8, 2019 because they contain inadmissible hearsay. Dkt. 94, p. 12. Mr. Bell did not address this issue in his opposition.

At summary judgment, a district court may consider hearsay evidence submitted in an inadmissible form, so long as the underlying evidence could be provided in an admissible form at trial, such as by live testimony. *JL Beverage Co., LLC v. Jim Beam Brancs Co.*, 828 F.3d 1098,

REPORT AND RECOMMENDATION - 10

1110 (9th Cir. 2016); *see also*, *Hughes v. United States*, 953 F.2d 531, 543 (9th Cir. 1992) (affidavit may be considered on summary judgment despite hearsay and best evidence rule objections where facts underlying the affidavit would be admissible as evidence even if the affidavit itself was not).

PrivacyGuard is not a party to this lawsuit and no evidence has been submitted regarding the accuracy of the two PrivacyGuard Reports submitted by Mr. Bell. Dkt. 96, Ex. 1 and 5. There is no evidence as to how PrivacyGuard gathered and compiled its information and in responses to discovery requests, PrivacyGuard states that it does not maintain records of the data it gathers in preparing its credit summaries. Dkt. 94, Ex. O. PrivacyGuard also disclaims liability as to the accuracy of information contained in its reports.[6]

Mr. Bell attests that the PrivacyGuard Reports attached to his declaration as Exhibits 1 and 5, are true and correct copies of the "combined consumer report(s)" that he retrieved from PrivacyGuard on May 10, 2019 and October 8, 2019, and that after he retrieved the First PrivacyGuard Report identified as Exhibit 1, he "notice[ed] the inaccuracy on [his] credit report." Dkt. 96-2, Declaration of Donte Bell, ¶¶ 4, 5, and 8; Exhibits 1 and 5. Mr. Bell has submitted no further facts or testimony as to the contents of the reports.

Mr. Bell may testify that he obtained and reviewed the PrivacyGuard Reports and may testify to his understanding of their contents because this testimony is based on his personal

---

[6] PrivacyGuard identifies itself as a "service of Trilegiant Corporation in conjunction with Trilegiant Insurance Services, Inc. and Alliance Marketing Association" and disclaims liability for any credit reports: "Trilegiant Corporation, Trilegiant Insurance Services, Inc., and Alliance Marketing Association and their credit information subcontractors shall not have any liability for the accuracy of the information contained in the credit reports, credit scores, Credit Alert® reports or other reports which you receive in connection with the PrivacyGuard service, including any liability for damages, direct or indirect, consequential or incidental." *See* www.privacyguard.com; last visited by the Court on January 11, 2021.

REPORT AND RECOMMENDATION - 11

knowledge. However, Mr. Bell lacks the personal knowledge to testify as to the manner in which the contents of the PrivacyGuard Reports were compiled, where and how PrivacyGuard obtained its information, whether the information contained in the reports is accurate, or how the information is to be analyzed, and he has not presented the testimony of any person with knowledge who can do so.

The contents of the PrivacyGuard Reports are hearsay as they are statements that Mr. Bell did not make while testifying at the current trial or hearing and they are being offered to prove the truth of the matter asserted, *i.e.*, that the information contained in the reports were furnished by NCS to Experian, Trans Union, and Equifax. Fed. R. Evid. 801(c). Hearsay is inadmissible unless a federal statute, the Rules, or other rules prescribed by the Supreme Court provide otherwise. Fed. R. Evid. 802. Mr. Bell did not respond to NCS's objection that the reports are hearsay and has offered no exception to the hearsay rule. In addition, the accuracy of the reports cannot be verified because PrivacyGuard does not maintain a database of the information it retrieved in compiling its reports. Dkt. 94, Ex. O.

Thus, the PrivacyGuard Reports are inadmissible hearsay and will not be considered as evidence of NCS's reporting of Mr. Bell's debts.

DISCUSSION

A.    <u>WPCA Claim</u>

Mr. Bell states that the WPCA claim (Count V – RCW Unfair Business Practices – Consumer Protection Act) was included in error in his Second Amended Complaint and stipulates to its dismissal. Dkt. 96, p. 29. Accordingly, it is recommended that Count V be dismissed with prejudice.

1    B.    Fair Credit Reporting Act ("FCRA")

2        "Congress enacted the Fair Credit Reporting Act ("FCRA"), 15 U.S.C. §§ 1681–1681x,

3    in 1970 'to ensure fair and accurate credit reporting, promote efficiency in the banking system,

4    and protect consumer privacy.'" *Gorman v. Wolpoff & Abramson, LLP*, 584 F.3d 1147, 1153

5    (9th Cir. 2009) (quoting *Safeco Ins. Co. of Am. v. Burr*, 551 U.S. 47, 127 S.Ct. 2201, 2205, 167

6    L.Ed.2d 1045 (2007)).

7        To ensure that credit reports are accurate, the FCRA sets forth two categories of

8    responsibilities of furnishers of information to CRAs. *Gorman*, 584 F.3d at 1153. The second

9    category of responsibilities, found in subsection 1681s-2(b), provides that, after receiving a

10    notice of dispute [from a CRA], the furnisher is obligated to investigate and modify and correct

11    any incomplete or inaccurate information. 15 U.S.C. § 1681s-2(b)(1). These duties arise only

12    after the furnisher receives notice of dispute from a CRA; notice of a dispute received directly

13    from the consumer does not trigger furnishers' duties under subsection (b). *See Nelson v. Chase*

14    *Manhattan Mortgage Corp.*, 282 F.3d 1057, 1059–60 (9th Cir.2002).

15        By reporting to the CRAs, NCS is a furnisher under the FCRA. NCS argues however,

16    that Mr. Bell lacks standing to bring his FRCA claim because he has not suffered an injury in

17    fact that is fairly traceable to any conduct of NCS.[7] Put more plainly, there is no evidence that

18    NCS was incorrectly reporting Mr. Bell's debts to the CRAs. The Court agrees.

19        The four elements of a FCRA claim are: (1) a credit reporting inaccuracy existed on

20    plaintiff's credit report; (2) plaintiff notified the consumer reporting agency that plaintiff

21

22    _____

[7] To have standing, a plaintiff "must have (1) suffered an injury in fact, (2) that is fairly traceable
to the challenged conduct of the defendant, and (3) that is likely to be redressed by a favorable
judicial decision." *Spokeo, Inc. v. Robins*, 136 S.Ct. 1540, 1547 (2016). Plaintiff carries the
burden of establishing those three elements with facts demonstrating each element. *Buchholz v.*
*Meyer Njus Tanick, PA*, 946 F.3d 855, 861 (6th Cir. 2020).

23

1    disputed the reporting as inaccurate; (3) the consumer reporting agency notified the furnisher of

2    the alleged inaccurate information of the dispute; and (4) the furnisher failed to investigate the

3    inaccuracies or further failed to comply with the requirements in 15 U.S.C. 1681s–2(b)(1)(A)–

4    (E). *Gorman*, 584 F.3d at 1153-54.

5         Mr. Bell cannot show a crucial element of his FCRA claim, *i.e.*, a credit reporting

6    inaccuracy existed on his credit report due to inaccurate reporting by NCS. There is no evidence

7    that the PrivacyGuard Reports are credit reports, no actual credit report has been produced, and it

8    is undisputed that NCS does not furnish information to PrivacyGuard. NCS's records reflect that

9    it did not report "duplicative" accounts (or trade lines) and Trans Union's investigation revealed

10   that both before and after receiving Mr. Bell's dispute, it was reporting only one debt for Copper

11   Ridge and one debt for SureDeposit.

12        Mr. Bell argues that it is irrelevant that NCS did not furnish information to PrivacyGuard

13   because PrivacyGuard is a consumer reporting agency and re-seller, PrivacyGuard's Reports are

14   credit reports, and the reports contain inaccuracies. Dkt. 96, p. 14. There is no evidentiary

15   support for these contentions.

16        A consumer reporting agency is any person which, for monetary fees, dues, or on a

17   cooperative nonprofit basis, regularly engages in whole or in part in the practice of assembling or

18   evaluating consumer credit information or other information on consumers for the purpose of

19   furnishing consumer reports to third parties, and which uses any means or facility of interstate

20   commerce for the purpose of preparing or furnishing consumer reports. 15 U.S.C. § 1681a(f).

21   There is no evidence that PrivacyGuard is a consumer reporting agency.

22        A "reseller" under the FCRA is *a consumer reporting agency* that—(1) assembles and

23   merges information contained in the database of another consumer reporting agency or multiple

1    consumer reporting agencies concerning any consumer for purposes of furnishing such

2    information to any third party, to the extent of such activities; and (2) does not maintain a

3    database of the assembled or merged information from which new consumer reports are

4    produced." *Starkey v. Experian Info. Solutions, Inc*., 32 F. Supp. 3d 1105, 1109 (C.D. Cal. 2014)

5    (quoting 15 U.S.C.A. § 1681a(u)).

6         Although PrivacyGuard appears to be assembling information from consumer reporting

7    agencies, there is no evidence that PrivacyGuard itself is either a consumer reporting agency or a

8    reseller for purposes of the FCRA. Indeed, if PrivacyGuard is a consumer reporting agency or re-

9    seller, it would be obligated to investigate upon receipt of a dispute. Because it appears that the

10   PrivacyGuard Reports are the source of Mr. Bell's confusion, it is puzzling that Mr. Bell did not

11   file a dispute directly with PrivacyGuard.

12        In court filings by PrivacyGuard's parent company Trilegiant, PrivacyGuard is identified

13   not as a reseller but as a "membership program." *See* Exhibits 1-3 attached to Dkt. 97 (*Delgado*

14   *et al. v. Ocwen Loan Servicing, LLC et al* (EDNY Case No. Dkt. 313 Case No. 13-4427, Ex. 1);

15   *Trilegiant Corporation v. Sitel Corporation* (EDNY Case No. 09-6492; Ex. 2); *Citizens Bank,*

16   *N.A. v. Trilegiant Corporation, et al*. (District of Rhode Island Case No. 16-438; Ex. 3).[8]

17        Contrary to Mr. Bell's position, it is relevant that NCS did not furnish information to

18   PrivacyGuard because there is simply no evidence that NCS furnished *false* information to the

19   CRAs. The record reflects only that Mr. Bell paid PrivacyGuard for two reports which

20   purportedly compiled the records of the CRAs and Mr. Bell contacted the CRAs for an

21   explanation of the "confusing reporting of multiple accounts on my credit that seem to refer to

22

23

---

[8] The Court can take judicial notice of matters of public record, such as pleadings in another
action and records and reports of administrative bodies. Fed.Rules Evid.Rule 201, 28 U.S.C.A.

one debt with Copper Ridge" because "there should be only ONE alleged debt associated with this apartment." Dkt. 94, Ex. K.

As to Mr. Bell's claim that there was "only ONE" debt associated with the Copper Ridge apartment, he acknowledges that "if he owed money when he moved out of Copper Ridge, Sure Deposit would immediately pay the owed amount, and Plaintiff would then pay Sure Deposit if and when he owed anything." Dkt. 59, ¶ 36. Mr. Bell acknowledges that when he reviewed the PrivacyGuard Reports in relation to Trans Union's reporting of two separate debts, he understood that Sure Deposit had paid Copper Ridge the $1,500 and that he "now owed that amount to Sure Deposit, as was allegedly established in his original agreement with Sure Deposit." *Id.*, ¶ 47. Although Mr. Bell appears to be referring to the second PrivacyGuard Report reflecting Trans Union's reporting of two separate debts, the first PrivacyGuard Report, which was issued on May 10, 2019 (over a month before Mr. Bell sent his letters to the CRAs), also reflects Trans Union's reporting of only two separate debts. Thus, Mr. Bell appears to have been in possession of information on May 19, 2020 reflecting that two separate debts (for a total of $6,893.56) were being reported.[9]

Counsel for Mr. Bell argues that the CRAs were reporting Mr. Bell's debts multiple times and therefore, it appeared that he owed two times, four times, or even six times the amount of his original debts. Counsel also argues that it is these "multiple tradelines" that Mr. Bell was really referring to when he mentioned "multiple accounts" in his dispute letter. The latter contention is not at all clear and Mr. Bell does not allege or attest to what he meant by the reference to "multiple accounts" in his dispute letter. Based on the record, the Court is unable to conclude

---

[9] The May 14, 2019 Debt Validation Email is addressed in the Court's analysis of Mr. Bell's claim that NCS falsely represented the nature of the debts to Mr. Bell.

1    that multiple tradelines existed – as opposed to the same debts being reflected in different

2    categories of debt  – because no evidence has been submitted to show how the PrivacyGuard

3    Reports were compiled or how they are to be interpreted, and PrivacyGuard expressly disclaims

4    liability as to the accuracy of its reports. In addition, Trans Union's dispute response directly

5    contradicts the PrivacyGuard Reports as it reflects that its record always reflected two accounts

6    reported by NCS (one for Sure Deposit in the amount of $1,500 and one for Copper Ridge in the

7    amount of $5,393) and that the only change it made to its record following Mr. Bell's dispute

8    and its investigation, was to update its record with the date. Dkt. 94, Ex. M.

9        The summary judgment evidence reflects that NCS has never furnished credit

10    information to PrivacyGuard and has been submitting credit reporting to the CRAs for one

11    account for Copper Ridge (Account No. 3073822) and one account for Sure Deposit (Account

12    No. 3073823), and that this reporting has not changed since the Copper Ridge and Sure Deposit

13    accounts were referred to NCS in April 2014. Dkt. 94, Ex. P, Sapp Decl., ¶¶ c.9, c.10.

14        Because PrivacyGuard's reporting is not evidence of NCS's reporting, Mr. Bell has not

15    shown an injury fairly traceable to NCS and the undersigned recommends that NCS's motion for

16    summary judgment on Mr. Bell's FRCA claim be granted.

17    C.    Fair Debt Collection Practices Act ("FDCPA")

18        In his Second Amended Complaint alleges NCS violated 15 U.S.C. § 1692e(8) when

19    NCS sent the Debt Verification Email, which Mr. Bell claims falsely represents that he was

20    responsible for paying $6,893.56 to Copper Ridge, when NCS knew that Sure Deposit was

21    responsible for paying $1,500 on the $6,893.56. *See* Dkt. 59 (Second Amended Complaint), pp.

22    15-16. In his opposition brief, Mr. Bell argues that the Debt Verification Email also violated

23    additional sections of the FDCPA (§ 1692e(2)(A), § 1692f, and § 1692g(b)). Dkt. 96, pp. 25-27.

1    NCS argues that Mr. Bell is inappropriately attempting to expand the nature of his claim.

2    However, it is not unusual for an action to violate more than one FDCPA provision. *See Fox v.*

3    *Citicorp Credit Services, Inc.*, 15 F.3d 1507, 1516 n. 10 ("Thus, even absent a separate 1692c

4    claim, we conclude that this conduct may be relevant to a harassment claim.") (citing 53

5    Fed.Reg. at 50,109 (FTC commentary) (in many cases, several different FDCPA sections may

6    apply to given factual situation).

7        NCS also argues that, as with his FCRA claim, Mr. Bell's FDCPA claim may be

8    dismissed for lack of standing. In the FDCPA claim, however, Mr. Bell is contending that a

9    communication sent to him directly by NCS violates one or more of FDCPA's provisions, *i.e.*,

10   the Debt Verification Email sent by NCS to Mr. Bell on May 14, 2019. Dkt. 96, Ex. 2. *See, e.g.*,

11   *Linehan v. Allianceone Receivables Mgmt., Inc.*, No. C15-1012-JCC, 2016 WL 4765839, at *6-8

12   (W.D. Wash. Sept. 13, 2016) (allegations of the FDCPA itself constitutes a concrete harm

13   sufficient to confer standing).

14       The FDCPA provisions at issue in this case are (1) §§ 1692e and e(2)(A) (prohibiting

15   "false, deceptive, or misleading representation or means in connection with the collection of any

16   debt," including "the character, amount, or legal status of any debt"); (2) § 1692g(b) (requiring a

17   cessation of debt collection and forwarding requested information to debtor upon receipt of

18   dispute); (3) §§ 1692f and 1692e(8) (prohibiting unfair or unconscionable means in the

19   collection of any debt including false, deceptive, or misleading representations).

20       To determine if conduct violates the FDCPA, the Court must engage in an objective

21   analysis that takes into account, whether "the least sophisticated debtor would likely be misled

22   by a communication." *See Guerrero v. RJM Acquisitions LLC*, 499 F.3d 926, 934 (9th Cir.2007)

23   (internal quotation marks omitted). "The least sophisticated consumer can be presumed to

REPORT AND RECOMMENDATION - 18

possess a rudimentary amount of information about the world and a willingness to read a

collection notice with some care." *LeBlanc v. Unifund CCR Partners*, 601 F.3d 1185, 1194 (11th

Cir. 2010) (citing *Clomon v. Jackson*, 988 F.2d 1314, 1319 (2d Cir. 1993)) (internal quotation

marks omitted).

Mr. Bell contends that the Debt Verification Email violated the FDCPA because it falsely

represented only one debtor, failed to provide all relevant information, and referred to the wrong

account number. Dkt. 96, pp. 25-27. Mr. Bell also contends that NCS's false reporting of "up to

six tradelines," violated § 1692e(8). Dkt. 96, pp. 26-27. As to this latter argument, the Court has

already concluded that there is no evidence that NCS falsely reported multiple tradelines to the

CRAs. Therefore, to the extent any portion of Mr. Bell's FDCPA claim is based on the multiple

"tradelines" contained in the PrivacyGuard Reports, they should be dismissed.

The contents of the Debt Verification Email are not in dispute. The email itself along

with the attached itemized account statement indicate that Mr. Bell owed Copper Ridge the

amount of $6,893.56. Both the email and itemized account statement refer to Account No.

3057738 for the debt owed on Copper Ridge Apt. Unit K103 (which is different from the NCS

account numbers assigned to the Copper Ridge (3073822) and Sure Deposit (3073823) debts).

The itemized account statement mirrors Copper Ridge's October 20, 2014 Final Account

Statement to Mr. Bell relating to Apt. K103. Neither the email nor the itemized account

statement refers to Sure Deposit or its payment of the $1,500 Bond.

Whether conduct violates various provisions of the FDCPA requires an objective analysis

that considers whether "the least sophisticated debtor would likely be misled by a

communication." *Guerrero*, 499 F.3d at 934 (internal quotation marks omitted) (stating this

standard applies to §§ 1692d, 1692e, and 1692f); *see Wade v. Reg'l Credit Ass'n*, 87 F.3d 1098,

1099–1100 (9th Cir.1996); *Swanson v. S. Or. Credit Serv., Inc.*, 869 F.2d 1222, 1227 (9th Cir.1988). The FDCPA is designed "to provide information that helps consumers to choose intelligently" in dealing with their debts. *Donohue v. Quick Collect, Inc.*, 592 F.3d 1027, 1033 (9th Cir.2010), quoting *Hahn v. Triumph P'ships LLC*, 557 F.3d 755, 758 (7th Cir.2009). False but non-material representations are not likely to mislead the least sophisticated consumer and therefore are not actionable under §§ 1692e or 1692f. *Donohue,* 592 F.3d at 1033.

In assessing FDCPA liability, the Ninth Circuit is not concerned with mere technical falsehoods that mislead no one, but instead with genuinely misleading statements that may frustrate a consumer's ability to intelligently choose his response. *Id.* (quoting *Hahn v. Triumph P'ships LLC*, 557 F.3d 755, 757–58 (7th Cir.2009). For example, the identity of a consumer's original creditor is a critical piece of information and therefore its false identification in a dunning letter would be likely to mislead some consumers in a material way. *Tourgeman v. Collins Financial Services, Inc.*, 755 F.3d 1109, 1121 (9th Cir.2014).

Looking at the issue objectively, the Court concludes that the Debt Verification Email was not likely to mislead the least sophisticated consumer because it (1) was made in response to information requested by the debtor;[10] (2) correctly identified the total amount of the debt; (3) correctly identified the original creditor and provided an itemization of "the charges assessed by the original creditor" for Copper Ridge Apts for Unit K103, which essentially mirrors the October 20, 2014 Copper Ridge Final Statemen (*cf.* Dkt. 96, Ex. 2 with Dkt. 94, Ex. D, p.2); (4) set forth that the communication was from a debt collector "whose efforts are solely on behalf of

---

[10] Although counsel argues that the Debt Verification Email was in response to Mr. Bell's April 23, 2019 letter (Dkt. 94, Ex. I), there is insufficient evidence to allow this assumption. The record reflects that NCS sent a letter requesting additional information after in received Mr. Bell's April 23, 2019 letter. The Debt Verification Email was sent later and after Mr. Bell's May 10, 2019 telephone call to NCS.

1   the current creditor who has previously validated this debt"; and (5) advised that payment could

2   be made in full to the debt collector.

3        Counsel argues that the Debt Verification Email, with its reference to only one creditor

4   and an entirely different account number, understandably added to Mr. Bell's confusion caused

5   by the PrivacyGuard Reports, and when considered together, "NCS's letter and its credit

6   reporting, the least sophisticated debtor would assume from NCS's communication the falsity

7   that Mr. Bell owed (at a minimum) three separate debts for three separate accounts," *i.e*.

8   $6,893.56 to Copper Ridge; $5,393.00 to NCS or Copper Ridge under a different account

9   number; and $1,500.00 to Sure Deposit, also under a different account number. Dkt. 96, p. 25.

10  As previously discussed however, Mr. Bell has produced no admissible evidence of NCS's

11  reporting to the CRAs and there is no evidence that Mr. Bell was misled or confused by the Debt

12  Verification Email. Even though Mr. Bell might not have known at the time Sure Deposit paid

13  the Bond in 2014, his pleadings indicate that at the very least, he would have been aware that

14  Sure Deposit had paid the Bond when he reviewed PrivacyGuard's May 10, 2019 report, which

15  was obtained by Mr. Bell four days before the Debt Verification Email was sent. And, although

16  Mr. Bell may have been confused by the manner in which PrivacyGuard compiled the credit

17  reports from Experian, Trans Union, and Expedia, there is no evidence that information

18  furnished by NCS contributed to that confusion or even that the multiple references within the

19  PrivacyGuard compilation of categories actually constitute multiple "tradelines."

20       Here, the different account number and failure to refer to Sure Deposit did not undermine

21  Mr. Bell's ability to intelligently choose an action concerning his debt. He could have challenged

22  the accuracy or legality of the total debt owed or could have paid the accurately stated sum of

23  $6,893.56 to NCS settle his debt. Even if the Debt Verification Email had referenced that $1,500

of Mr. Bell's total debt would be paid to Sure Deposit, the Court cannot conceive of any action

Mr. Bell could have taken and Mr. Bell has not articulated any different action he might have

chosen.

Based on the foregoing, the undersigned recommends NCS's motion for summary

judgment on Mr. Bell's FDCPA claim be granted.[11]

<u>OBJECTIONS AND APPEAL</u>

This Report and Recommendation is not an appealable order. Therefore, a notice of

appeal seeking review in the Court of Appeals for the Ninth Circuit should not be filed until the

assigned District Judge enters a judgment in the case.

Objections, however, may be filed and served upon all parties no later than Monday,

**February 1, 2021.** The Clerk should note the matter for Wednesday, **February 3, 2021,** as

ready for the District Judge's consideration if no objection is filed. If objections are filed, any

response is due within 14 days after being served with the objections. A party filing an objection

must note the matter for the Court's consideration 14 days from the date the objection is filed

and served. The matter will then be ready for the Court's consideration on the date the response

is due. Objections and responses shall not exceed six (6) pages. The failure to timely object may

affect the right to appeal.

DATED this 12th day of January, 2021.

_____
BRIAN A. TSUCHIDA
Chief United States Magistrate Judge

---

[11] In light of this conclusion, the Court does not reach NCS's argument that Mr. Bell's FDCPA
claim is barred by the statute of limitations.

REPORT AND RECOMMENDATION - 22